1  Christopher  Campanella
2  309 Phillips Rd
3  Valley Falls NY 12185
4  Phone: 518-772-4737

U.S. DISTRICT COURT
N.D. OF N.Y.
FILED

JUN 1 1 2010

LAWRENCE K. BAERMAN, CLERK
ALBANY

5       UNITED STATES DISTRICT COURT
6       NORTHERN DISTRICT OF NEW YORK

**Christopher  Campanella**

Plaintiff,

vs.

**Aurora Loan Servicing**

Defendant

Case #  **10 -CV- 0685** LEK / DRH

**ORIGINAL PETITION AND
PETITION FOR RESTRAINING
ORDER**

Date: 6/11/10

7

8

9   Comes now   Christopher   Campanella, hereinafter referred to as "Petitioner," and

10  moves the court for relief as herein requested:

11                                    **PARTIES**

12  Petitioner is    Christopher   Campanella, 309 Phillips Rd   Valley Falls, NY  12185.

13  Currently Known Defendant(s) are/is:  Aurora Loan Servicing , 2617 College Park ,  Scotsbluff ,

14  NE 69361.

15                              **STATEMENT OF CAUSE**

16  Petitioner, on the 5th day of January, 2006, entered into a consumer contract for the refinance of a

17  residence  located  at  508  Washington  Avenue,  Albany  NY,  hereinafter  referred  to  as  the

18  "property."

19  Defendants, acting in concert and collusion with others, induced Petitioner to enter into a

20  predatory loan agreement with Defendant.

21  Defendants committed numerous acts of fraud against Petitioner in furtherance of a carefully

22  crafted scheme intended to defraud Petitioner.

ORIGINAL PETITION AND PETITION FOR RESTRAINING ORDER          1 of 25

23    Defendants failed to make proper notices to Petitioner that would have given Petitioner warning
24    of the types of tactics used by Defendants to defraud Petitioner.

25    Defendants charged false fees to Petitioner at settlement.

26    Defendants used the above referenced false fees to compensate agents of Petitioner in order to
27    induce said agents to breach their fiduciary duty to Petitioner.

28    Defendant's attorney caused to be initiated collection procedures, knowing said collection
29    procedures in the instant action were frivolous as lender is estopped from collection procedures,
30    under authority of Uniform Commercial Code 3-501, subsequent to the request by Petitioner for
31    the production of the original promissory note alleged to create a debt.

32                                                **IN BRIEF**
33                                    *(Non-factual Statement of Posture and Position)*

34     It is not the intent of Petitioner to indict the entire industry.  It is just that Plaintiff will be
35    making a number of allegations that, outside the context of the current condition of the real
36    estate industry, may seem somewhat outrageous and counter-intuitive.

37    When Petitioner accuses ordinary individuals of acting in concert and collusion with an
38    ongoing criminal conspiracy, it tends to trigger an incredulous response as it is
39    unreasonable to consider that all Agents, loan agents, appraisers, and other ordinary
40    people, just doing what they have been trained to do, are out to swindle the poor
41    unsuspecting borrower.

42    The facts Petitioner is prepared to prove are that Petitioner has been harmed by fraud
43    committed by people acting in concert and collusion, one with the other.  Petitioner has no
44    reason to believe that the Agent, loan officer, appraiser, and others were consciously aware
45    that what they were doing was part of an ongoing criminal conspiracy, only that it was,
46    and they, at the very least, kept themselves negligently uninformed of the wrongs they
47    were perpetrating.

48    Petitioner maintains that the real culprit is as much the system itself, including the courts,
49    for failure to strictly enforce the protections that remain in place in order to give lenders
50    good cause to exercise care in their dealings with unsuspecting consumers.

51                              **CAREFULLY CRAFTED CRIMINAL CONNIVANCE**
52                                        *(General State of the Real Estate Industry)*
      ORIGINAL PETITION AND PETITION FOR RESTRAINING ORDER            2 of 25

53    ***THE BEST OF INTENTIONS***

54    Prior to the 1980's and 1990's ample government protections were in place to protect the
55    consumer and the lending industry from precisely the disaster we now experience.
56    President Clinton's administration, under the guise of making housing available to the
57    poor, primary protections were relaxed which had the effect of releasing the money
58    changers on us all.

59    Under the pre-existing, carefully crafted monetary scheme, Lenders created loans then
60    they then stood the risk for said loan, and most Americans were, consequently, engaged in
61    safe and stable home mortgages.  With the protections removed, the money changers
62    swooped in and, instead of making loans available to the poor, they used the opportunity to
63    convince the unsophisticated American public to do something that had been essentially
64    taboo; they were convinced to speculate with their most important investment, their
65    homes.

66    Aurora Loan Servicing , Ameriquest, Country Wide, and many others swooped in and
67    convinced Americans to sell their homes, get out of the safe mortgage agreements, and
68    speculate with the equity by purchasing homes they could not afford.  Lenders created
69    loans intended to fail as, under the newly crafted system, the Lender profited more from a
70    mortgage default than from a stable loan.

71    Companies cropped up who called themselves banks when, in fact, they were only either
72    subsidiaries of banks, or unaffiliated companies that were operated for the purpose of
73    creating and selling promissory notes.  These companies then profited from the failure of
74    the underlying loans.

75    ***HOW IT WORKS***

76    Briefly, how it works is this, the Lender would secure a large loan from a large bank,
77    convert that loan into 20 and 30 year mortgages, then sell the promise to pay to an
78    investor.

79    An agent, usually a Agent, would contract with a seller to find a buyer, then bring both
80    seller and buyer to a lender who would secure the title from the seller using the funds
81    borrowed for that purpose then trade the title to the buyer in exchange for a promise to pay
82    a certain amount over a stipulated term.  The lender, however, has created a 20 or 30 year
83    mortgage with money the lender must repay within 6 months, therefore, as soon as the

84   closing is consummated, the promissory note is pooled together with others and sold to an
85   investor.

86   Using the instant case as an example, a $120,000.00 note at 9.5970%  interest over 30
87   years will produce $368,521.30    The lender can then offer up the security at say 50% of
88   the future value to the investor.   The investor will, over the life of the note, less
89   approximately 3.00% servicing fees, realize $178,732.83 .  The lender can then pay back
90   the bank and retain a handsome profit in the amount of $69,788.47. The lender, however,
91   is not done with the deal.

92   The lender signed over the promissory note to the investor at the time of the trade, did not
93   sign over the lien document.  The State of Kansas Supreme Court addressed this issue and
94   stated that such a transaction was certainly legal, however, it created a fatal flaw in that,
95   the holder of the lien document, at time of sale of the security instrument, received
96   consideration in excess of the lien amount, and therefore, the lender could not be harmed
97   and the lien became a void document.

98   This begs a question, if keeping the lien would render it void, why would the lender not
99   simply transfer the lien with the promissory note?  As always, follow the money.   The
100  lender will hold the lien for three years, file an Internal Revenue Form 1099a, claim the
101  full amount of the lien as abandoned funds, and deduct the full amount from the lender's
102  tax liability. The lender, by this maneuver, gets consideration a second time and still the
103  lender is not done profiting from the deal.

104  After sale of the promissory note, the lender remains as the servicer for the investor.  The
105  lender will receive 3% of each payment the lender collects and renders to the investor
106  pool.  However, if the payment is late, the lender is allowed to assess an extra 5% and keep
107  that amount.  Also, if the loan defaults, the lender stands to gain a considerable amount for
108  handling the foreclosure.

109  The lender stands to profit far more from a note that is overly expensive in the first
110  instance, then slow to pay in the second, then ultimately fails in the third, than from good
111  stable loan.  And where, you may ask, does all this profit come from?  It comes from the
112  equity the lender convinced the borrower to invest in the new purchase, and still the lender
113  is not finished profiting from the deal.

114  The last nail was driven in the American financial coffin on the last day of the Congress in
115  2000 when they removed a restriction that had been in place since the economic collapse

ORIGINAL PETITION AND PETITION FOR RESTRAINING ORDER          4 of 25

116   of 1907. At that time, investors were allowed to bet on stocks without actually buying
117   them. This unbridled speculation lead directly to an economic collapse so the legislature
118   banned the practice, until the year 2000. The money changers got their way on the last
119   day, the last act of the session, when congress opened the process against and it took only
120   8 years to crash the stock market again.

121   The lender was not done profiting from the loan he created as he was then free to bet on
122   the failure of the security.

123   The unsuspecting consumer was lulled into accepting the pronouncements of the Agent
124   agents, the lenders, appraiser, underwriters, and trustees as all were acting under the cover
125   of government regulation. Unfortunately, the regulations in place to protect the consumer
126   from just this kind of abuse were simply being ignored.

127   The loan origination fee from of the HUD1 settlement statement is the finder's fee paid for
128   the referral of the client to the lender by a person acting as an agent for the borrower.
129   Hereinafter, the person or entity who receives any portion of the yield spread premium, or
130   a commission of any kind consequent to securing the loan agreement through from the
131   borrower will be referred to as "Agent." The fee, authorized by the consumer protection
132   law is restricted to 1% of the principal of the note. It was intended that the Agent, when
133   seeking out a lender for the borrower, would seek the best deal for his client rather than
134   who would pay him the most. That was the intent, but not the reality. The reality is that
135   Agents never come away from the table with less than 2% or 3% of the principal. This is
136   accomplished by undisclosed fees to the Agent in order to induce the Agent to breach his
137   fiduciary duty to the borrower and convince the borrower to accept a more expensive loan
138   product that the borrower qualifies for. This will generate more profits for the lender and,
139   consequently, for the Agent.

140   It was a common practice for lenders to coerce appraisers to give a higher appraisal than is
141   the fair market price. This allows the lender to increase the cost of the loan product and
142   give the impression that the borrower is justified in making the purchase.

143   The lender then charges the borrower an underwriting fee in order to convince the
144   borrower that someone with knowledge has gone over the conditions of the note and
145   certified that the meet all legal criteria.

146 The entire loan process is a carefully contrive connivance designed and intended to induce
147 the unsophisticated borrower into accepting a loan product that is beyond the borrowers
148 means.

149 The trustee, at closing, participates actively in the deception of the borrower by placing
150 undue stress on the borrower to sign the large stack of paperwork without reading it. The
151 trustee is, after all, to be trusted and has been paid to insure the transaction. This trust is
152 systematically violated for the purpose of taking unfair advantage of the borrower.

153 With all this, it should be a surprise to no one that this country is having a real estate crisis.

154 **PETITIONER WILL PROVE THE FOLLOWING**

155 Petitioner is prepared to prove, by a preponderance of evidence that:

156 Lender has no legal standing to bring collection or foreclosure claims against the property;

157 Lender is not a real party in interest in any contract which can claim a collateral interest in
158 the property;

159 even if Lender were to prove up a contract to which Lender had standing to enforce against
160 Petitioner, no valid lien exists which would give Lender a claim against the property;

161 even if Lender were to prove up a contract to which Lender had standing to enforce against
162 Petitioner, said contract was fraudulent in its creation as endorsement was secured by acts
163 of negligence, common law fraud, fraud by non-disclosure, fraud in the inducement, fraud
164 in the execution, usury, and breaches of contractual and fiduciary obligations by
165 Mortgagee or "Trustee" on the Deed of Trust, "Mortgage Agents," "Loan Originators,"
166 "Loan Seller," "Mortgage Aggregator," "Trustee of Pooled Assets," "Trustee or officers of
167 Structured Investment Vehicle," "Investment Banker," "Trustee of Special Purpose
168 Vehicle/Issuer of Certificates of 'Asset-Backed Certificates,'" "Seller of 'Asset-Backed'
169 Certificates (shares or bonds)," "Special Servicer" and Trustee, respectively, of certain
170 mortgage loans pooled together in a trust fund;

171 Defendants have concocted a carefully crafted connivance wherein Lender conspired with
172 Agents, et al, to strip Petitioner of Petitioner's equity in the property by inducing Plaintiff
173 to enter into a predatory loan inflated loan product;

174 Lender received unjust enrichment in the amount of 5% of each payment made late to
175 Lender while Lender and Lender's assigns acted as servicer of the note;

176   Lender and Lender's assigns, who acted as servicer in place Lender, profited by handling
177   the foreclosure process on a contract Lender designed to default;

178   Lender intended to defraud Investor by converting the promissory note into a security
179   instrument and selling same to Investor;

180   Lender intended to defraud Investor and the taxpayers of the United States by withholding
181   the lien document from the sale of the promissory note in order that Lender could then
182   hold the lien for three years, then prepare and file Internal Revenue Form 1099a and
183   falsely claim the full lien amount as abandoned funds and deduct same from Lender's
184   income tax obligation;

185   Lender defrauded backers of derivatives by betting on the failure of the promissory note
186   the lender designed to default;

187   Participant Defendants, et al, in the securitization scheme described herein have devised
188   business plans to reap millions of dollars in profits at the expense of Petitioner and others
189   similarly situated.

190                                **PETITIONER SEEKS REMEDY**

191   In addition to seeking compensatory, consequential and other damages, Petitioner seeks
192   declaratory relief as to what (if any) party, entity or individual or group thereof is the
193   owner of the promissory note executed at the time of the loan closing, and whether the
194   Deed of Trust (Mortgage) secures any obligation of the Petitioner, and a Mandatory
195   Injunction requiring re-conveyance of the subject property to the Petitioner or, in the
196   alternative a Final Judgment granting Petitioner Quiet Title in the subject property.

197   ***PETITIONER HAS BEEN HARMED***

198   Petitioner has suffered significant harm and detriment as a result of the actions of Defendants.

199   Such harm and detriment includes economic and non-economic damages, and injuries to
200   Petitioner's mental and emotional health and strength, all to be shown according to proof at trial.

201   In addition, Petitioner will suffer grievous and irreparable further harm and detriment unless the
202   equitable relief requested herein is granted.

## STATEMENT OF CLAIM

203

### *DEFENDANTS  LACKS STANDING*

204

**No evidence of Contractual Obligation**

205

206   Defendants claim a controversy based on a contractual violation by Petitioner but have failed to
207   produce said contract.  Even if Defendants produced evidence of the existence of said contract in
208   the form of an allegedly accurate photocopy of said document, a copy is only hearsay evidence
209   that a contract actually existed at one point in time.  A copy, considering the present state of
210   technology, could be easily altered.  As Lender only created one original and that original was
211   left in the custody of Lender, it was imperative that Lender protect said instrument.

212   In as much as the Lender is required to present the original on demand of Petitioner, there can be
213   no presumption of regularity when the original is not so produced.   In as much as Lender has
214   refused Petitioner's request of the chain of custody of the security instrument in question by
215   refusing to identify all current and past real parties in interest, there is no way to follow said
216   chain of custody to insure, by verified testimony, that no alterations to the original provisions in
217   the contract have been made.     Therefore, the alleged copy of the original is only hearsay
218   evidence that an original document at one time existed.  Petitioner maintains that, absent
219   production of admissible evidence of a contractual obligation on the part of Petitioner,
220   Defendants are without standing to invoke the subject matter jurisdiction of the court.

**No Proper Evidence of Agency**

221

222   Defendants claim agency to represent the principal in a contractual agreement involving
223   Petitioner, however, Defendants have failed to provide any evidence of said agency other than a
224   pronouncement that agency has been assigned by some person, the true identity and capacity of
225   whom has not been established.  Defendants can hardly claim to be agents of a principal then
226   refuse to identify said principal. All claims of agency are made from the mouth of the agent with
227   no attempt to provide admissible evidence from the principal.

228   Absent proof of agency, Defendants lack standing to invoke the subject matter jurisdiction of the
229   court.

230   **Special Purpose Vehicle**

231   Since the entity now claiming agency to represent the holder of the security instrument is not the
232   original lender, Petitioner has reason to believe that the promissory note, upon consummation of
233   the contract, was converted to a security and sold into a special purpose vehicle and now resides
234   in a Real Estate Mortgage Investment Conduit (REMIC)   as defined by the Internal Revenue
235   Code and as such, cannot be removed from the REMIC as such would be a prohibited
236   transaction.    If the mortgage was part of a special purpose vehicle and was removed on
237   consideration of foreclosure, the real party in interest would necessarily be the trustee of the
238   special purpose vehicle. Nothing in the pleadings of Defendants indicates the existence of a
239   special purpose vehicle, and the lack of a proper chain of custody documentation gives Petitioner
240   cause to believe defendant is not the proper agent of the real party in interest.

241   *CRIMINAL CONSPIRACY AND THEFT*

242   Defendants, by and through Defendant's Agents, conspired with other Defendants, et al, toward
243   a criminal conspiracy to defraud Petitioner. Said conspiracy but are not limited to acts of
244   negligence, breach of fiduciary duty, common law fraud, fraud by non-disclosure, and tortuous
245   acts of conspiracy and theft, to include but not limited to, the assessment of improper fees to
246   Petitioner by Lender, which were then used to fund the improper payment of commission fees to
247   Agent in order to induce Agent to violate Agent's fiduciary duty to Petitioner.

248   *AGENT PRACTICED UP-SELLING*

249   By and through the above alleged conspiracy, Agent practiced up-selling to Petitioner. In so
250   doing, Agent violated the trust relationship actively cultivated by Agent and supported by fact
251   that Agent was licensed by the state. Agent further defrauded Petitioner by failing to disclose
252   Agent's conspiratorial relationship to Lender,   Agent violated Agent's fiduciary duty to
253   Petitioner and the duty to provide fair and honest services, through a series of carefully crafted
254   connivances, wherein Agent proactively made knowingly false and misleading statements of
255   alleged fact to Petitioner, and by giving partial disclosure of facts intended to directly mislead
256   Petitioner for the purpose of inducing Petitioner to make decisions concerning the acceptance of
257   a loan product offered by the Lender. Said loan product was more expensive than Petitioner
258   could legally afford. Agent acted with full knowledge that Petitioner would have made a
259   different decision had Agent given complete disclosure.

260   ***FRAUDULENT INDUCEMENT***

261   Lender maliciously induced Petitioner to accept a loan product, Lender knew, or should have
262   known, Petitioner could not afford in order to unjustly enrich Lender.

263   ***EXTRA PROFIT ON SALE OF PREDATORY LOAN PRODUCT***

264   Said more expensive loan product was calculated to produce a higher return when sold as a
265   security to an investor who was already waiting to purchase the loan as soon as it could be
266   consummated.

267   **Extra Commission for Late Payments**

268   Lender acted with deliberate malice in order to induce Petitioner into entering a loan agreement
269   that Lender intend Petitioner would have difficulty paying.  The industry standard payment to the
270   servicer for servicing mortgage note is 3% of the amount collected.  However, if the borrower is
271   late on payments, a 5% late fee is added and this fee is retained by the servicer.  Thereby, the
272   Lender stands to receive more than double the regular commission on collections if the borrower
273   pays late.

274   **Extra Income for Handling Foreclosure**

275   Lender acted with deliberate malice in order to induce petitioner to enter into a loan agreement
276   on which Lender intend petitioner to default on.

277   In case of default, the Lender, acting as servicer, receives considerable funds for handling and
278   executing the foreclosure process.

279   **Credit Fault Swap Gambling**

280   Lender, after deliberately creating a loan intended to default is now in a position to bet on credit
281   fault swap derivatives.   Since Lender designed the loan to fail, betting on said failure is
282   essentially a sure thing.

283   ***LENDER ATTEMPTING TO FRAUDULENTLY COLLECT ON VOID LIEN***

284   Lender sold the security instrument immediately after closing and received consideration in an
285   amount in excess of the lien held by Lender.

286 Since Lender retained the lien document upon the sale of the security instrument, Lender
287 separated the lien from said security instrument, creating a fatal and irreparable flaw.

288 When Lender received consideration while still holding the lien and said consideration was in
289 excess of the amount of the lien, Lender was in a position such that he could not be harmed and
290 could not gain standing to enforce the lien. The lien was, thereby, rendered void.

291 Since the separation of the lien from the security instrument creates such a considerable concern,
292 said separation certainly begs a question: "Why would the Lender retain the lien when selling the
293 security instrument?"

294 When you follow the money the answer is clear. The Lender will hold the lien for three years,
295 then file and IRS Form 1099a and claim the full amount of the lien as abandoned funds and
296 deduct the full amount from Lender's tax liability, thereby, receiving consideration a second
297 time.

298 Later, in the expected eventuality of default by petitioner, Lender then claimed to transfer the
299 lien to the holder of the security, however, the lien once satisfied, does not gain authority just
300 because the holder, after receiving consideration, decides to transfer it to someone else.

301 ### *LENDER PROFIT BY CREDIT FAULT SWAP DERIVATIVES*

302 Lender further stood to profit by credit fault swaps in the derivatives market, by way of inside
303 information that Lender had as a result of creating the faulty loans sure to default. Lender was
304 then free to invest on the bet that said loan would default and stood to receive unjust enrichment
305 a third time. This credit default swap derivative market scheme is almost totally responsible for
306 the stock market disaster we now experience as it was responsible for the stock market crash in
307 1907.

308 ### *TRUTH IN LENDING STATEMENT VARIANCES*

309 The lender defrauded Petitioner by claiming a fraudulent payment amount not consistent with the
310 provisions of the contract entered into by Petitioner. If Petitioner paid the amount specified by
311 the Truth in Lending Statement, instead of the amount agreed to in the promissory note created
312 by Petitioner, Lender would have defrauded Petitioner of an amount equal to $168,592.87.

313   ***LENDER CHARGED FALSE FEES***

314   Lender charged fees to Petitioner that were in violation of the limitations imposed by the Real
315   Estate Settlement Procedures Act as said fees were simply contrived and not paid to a third party
316   vendor.

317   Lender charged other fees that were a normal part of doing business and should have been
318   included in the finance charge.

319   Below is a listing of the fees charged at settlement.  Neither at settlement, nor at any other time
320   did Lender or Trustee provide documentation to show that the fees herein listed were valid,
321   necessary, reasonable, and proper to charge Petitioner.

| 803 | Appraisal | $450.00 |
| 804 | Credit Report Fee | $60.00 |
| 805 | Flood Certification Fee | $32.00 |
| 806 | Assignment Fee | $18.50 |
| 807 | Processing Fee | $300.00 |
| 808 | Administration Fee | $150.00 |

322   Debtor is unable to determine whether or not the above fees are valid in accordance with the
323   restrictions provided by the various consumer protection laws.   Therefore, please provide; a
324   complete billing from each vendor who provided the above listed services; the complete contact
325   information for each vendor who provided a billed service; clearly stipulate as to the specific
326   service performed; a showing that said service was necessary; a showing that the cost of said
327   service is reasonable; a showing of why said service is not a regular cost of doing business that
328   should rightly be included in the finance charge.

329   The above charges are hereby disputed and deemed unreasonable until such time as said charges
330   have been demonstrated to be reasonable, necessary, and in accordance with the limitations and
331   restrictions included in any and all laws, rules, and regulations intended to protect the consumer

332   .

333   In the event lender fails to properly document the above charges, borrower will consider same as
334   false charges.  The effect of the above amounts that borrower would pay over the life of the note
335   will be an overpayment of $144,457.13.  This amount will be reduced by the amount of items
336   above when said items are fully documented.

337    ***RESPA PENALTY***

338    From a cursory examination of the records, with the few available, the apparent RESPA
339    violations are as follows: Good  Faith Estimate not within limits, No HUD-1 Booklet, Truth In
340    Lending Statement not within limits compared to Note, Truth in Lending Statement not timely
341    presented, HUD-1 not presented at least one day before closing, No Holder Rule Notice in Note,
342    No 1st Payment Letter.

343    The closing documents included no signed and dated : Financial Privacy Act Disclosure; Equal
344    Credit Reporting Act Disclosure; notice of right to receive appraisal report; servicing disclosure
345    statement; borrower's Certification of Authorization; notice of credit score; RESPA servicing
346    disclosure letter; loan discount fee disclosure; business insurance company arrangement
347    disclosure; notice of right to rescind.

348    The courts have held that the borrower does not have to show harm to claim a violation of the
349    Real Estate Settlement Procedures Act, as the Act was intended to insure strict compliance.  And,
350    in as much as the courts are directed to assess a penalty of no less than two hundred dollars and
351    no more than two thousand, considering the large number enumerated here, it is reasonable to
352    consider that the court will assess the maximum amount for each violation.

353    Since the courts have held that the penalty for a violation of RESPA accrues at consummation of
354    the note, borrower has calculated that, the number of violations found in a cursory examination
355    of the note, if deducted from the principal, would result in an overpayment on the part of the
356    borrower, over the life of the note, of $186,989.69.

357    If the violation penalty amounts for each of the unsupported fees listed above are included, the
358    amount by which the borrower would be defrauded is $244,404.42

359    Adding in RESPA penalites for all the unsupported settlement fees along with the TILA/Note
360    variance, it appears that lender intended to defraud borrower in the amount of $744,444.11.

361    ***LENDER CONSPIRED WITH APPRAISER***

362    Lender, in furtherance of the above referenced conspiracy, conspired with appraiser for the
363    purpose of preparing an appraisal with a falsely stated price, in violation of appraiser's fiduciary
364    duty to Petitioner and appraiser's duty to provide fair and honest services, for the purpose of
365    inducing Petitioner to enter into a loan product that was fraudulent toward the interests of
366    Petitioner.

367    ***LENDER CONSPIRED WITH TRUSTEE***

368    Lender conspired with the trust Agent at closing to create a condition of stress for the specific
369    purpose of inducing Petitioner to sign documents without allowing time for Petitioner to read and
370    fully understand what was being signed.

371    The above referenced closing procedure was a carefully crafted connivance, designed and
372    intended to induce Petitioner, through shame and trickery, in violation of trustee's fiduciary duty
373    to Petitioner and the duty to provide fair and honest services, to sign documents that Petitioner
374    did not have opportunity to read and fully understand, thereby, denying Petitioner full disclosure
375    as required by various consumer protection statutes.

376    ***DECEPTIVE ADVERTISING AND OTHER UNFAIR BUSINESS PRACTICES***

377    In the manner in which Defendants have carried on their business enterprises, they have engaged
378    in a variety of unfair and unlawful business practices prohibited by *15 USC Section 45* et seq.
379    (Deceptive Practices Act).

380    Such conduct comprises a pattern of business activity within the meaning of such statutes, and
381    has directly and proximately caused Petitioner to suffer economic and non-economic harm and
382    detriment in an amount to be shown according to proof at trial of this matter.

383    ***EQUITABLE TOLLING FOR TILA AND RESPA***

384    The Limitations Period for Petitioners' Damages Claims under TILA and RESPA should be
385    Equitably Tolled due to the DEFENDANTS' Misrepresentations and Failure to Disclose.

386    Any claims for statutory and other money damages under the Truth in Lending Act *(15 U.S.C. §*
387    *1601,* et. seq.) and under the Real Estate Settlement Procedures Act *(12 U.S.C. § 2601* et. seq.)
388    are subject to a one-year limitations period; however, such claims are subject to the equitable
389    tolling doctrine. The Ninth Circuit has interpreted the TILA limitations period in § 1640(e) as
390    subject to equitable tolling. In *King v. California, 784 F.2d 910 (9th Cir.1986),* the court held
391    that given the remedial purpose of TILA, the limitations period should run from the date of
392    consummation of the transaction, but that "the doctrine of equitable tolling may, in appropriate
393    circumstances, suspend the limitations period until the borrower discovers or has reasonable
394    opportunity to discover the fraud or nondisclosures that form the basis of the TILA action." *King*
395    *v. California, 784 F.2d 910, 915 9t*h Cir. 1986).

ORIGINAL PETITION AND PETITION FOR RESTRAINING ORDER        14 of 25

396   Likewise, while the Ninth Circuit has not taken up the question whether *12 U.S.C. § 2614,* the
397   anti-kickback provision of **RESPA,** is subject to equitable tolling, other Courts have, and hold
398   that such limitations period may be equitably tolled. The Court of Appeals for the District of
399   Columbia held that § 2614 imposes a strictly jurisdictional limitation, *Hardin v. City Title &*
400   *Escrow Co., 797 F.2d 1037, 1039-40 (D.C. Cir. 1986),* while the Seventh Circuit came to the
401   opposite conclusion. *Lawyers Title Ins. Corp. v. Dearborn Title Corp., 118 F.3d 1157, 1164 (7th*
402   *Cir. 1997).* District courts have largely come down on the side of the Seventh Circuit in holding
403   that the one-year limitations period in § 2614 is subject to equitable tolling. See, e.g., *Kerby v.*
404   *Mortgage Funding Corp., 992 F.Supp. 787, 791-98 (D.Md.1998); Moll v. U.S. Life Title Ins. Co.,*
405   *700 F.Supp. 1284, 1286-89 (S.D.N.Y.1988).* Importantly, the Ninth Circuit, as noted above, has
406   interpreted the TILA limitations period in *15 U.S.C. § 1640* as subject to equitable tolling; the
407   language of the two provisions is nearly identical. *King v. California, 784 F.2d at 914.* While not
408   of precedential value, this Court has previously found both the TILA and **RESPA** limitations
409   periods to be subject to equitable tolling. *Blaylock v. First American Title Ins. Co., 504*
410   *F.Supp.2d 1091,* (W.D. Wash. 2007). 1106-07.

411   The Ninth Circuit has explained that the doctrine of equitable tolling "focuses on excusable delay
412   by the Petitioner," and inquires whether "a reasonable Petitioner would ... have known of the
413   existence of a possible claim within the limitations period." *Johnson v. Henderson, 314 F.3d*
414   *409, 414 (9th Cir.2002), Santa Maria v. Pacific Bell, 202 F.3d 1170, 1178 (9th Cir.2000).*
415   Equitable tolling focuses on the reasonableness of the Petitioner's delay and does not depend on
416   any wrongful conduct by the Defendants. Santa Maria. at 1178.

417   ***BUSINESS PRACTICES CONCERNING DISREGARDING OF UNDERWRITING***
418   ***STANDARDS***

419   Traditionally, Lenders required borrowers seeking mortgage loans to document their income and
420   assets by, for example, providing W-2 statements, tax returns, bank statements, documents
421   evidencing title, employment information, and other information and documentation that could
422   be analyzed and investigated for its truthfulness, accuracy, and to determine the borrower's
423   ability to repay a particular loan over both the short and long term. Defendants deviated from and
424   disregarded these standards, particularly with regard to its riskier and more profitable loan
425   products.

426   **Low-Documentation/No-Documentation Loans.**

427    Driven by its desire for market share and a perceived need to maintain competitiveness with the
428    likes of Countrywide, Defendants began to introduce an ever increasing variety of low and no
429    documentation loan products, including the HARMs and HELOCs described hereinabove, and
430    began to deviate from and ease its underwriting criteria, and then to grant liberal exceptions to
431    the already eased underwriting standards to the point of disregarding such standards. This
432    quickened the loan origination process, allowing for the generation of more and more loans
433    which could then be resold and/or securitized in the secondary market.

434    Defendants marketed no-documentation/low-documentation loan programs that included
435    HARMs and HELOCs, among others, in which loans were given based on the borrower's "stated
436    income" or "stated assets" (SISA) neither of which were verified. Employment was verbally
437    confirmed, if at all, but not further investigated, and income, if it was even considered as a factor,
438    was to be roughly consistent with incomes in the types of jobs in which the borrower was
439    employed. When borrowers were requested to document their income, they were able to do so
440    through information that was less reliable than in a full-documentation loan.

441    For stated income loans, it became standard practice for loan processors, loan officers and
442    underwriters to rely on www.salary.com to see if a stated income was reasonable.  Such stated
443    income loans, emphasizing loan origination from a profitability standpoint at the expense of
444    determining the ability of the borrower to repay the loan from an underwriting standpoint,
445    encouraged the overstating and/or fabrication of income.

446    **Easing of Underwriting Standards**

447    In order to produce more loans that could be resold/securitized in the secondary mortgage
448    market, Defendants also relaxed, and often disregarded, traditional underwriting standards used
449    to separate acceptable from unacceptable risk. Examples of such relaxed standards was reducing
450    the base FICO score needed for a SISA loan.

451    Other underwriting standards that Defendants relaxed included qualifying interest rates (the rate
452    used to determine whether borrowers can afford the loan), loan to value ratios (the amount of
453    loan(s) compared to the appraised/sale price of the property, whichever is lower), and debt-to-
454    income ratios (the amount of monthly income compared to monthly debt service payments and
455    other monthly payment obligations.

456    With respect to HARMS, Defendants underwrote loans without regard to the borrower's long-
457    term financial circumstances,  approving the loan based on the initial fixed rate without taking
458    into account whether the borrower could afford the substantially higher payment that would
459    inevitably be required during the remaining term of the loan.

460    With respect to HELOCs, Defendants underwrote and approved such loans based only on the
461    borrower's ability to afford the interest-only payment during the initial draw period of the loan,
462    rather than on the borrower's ability to. afford the subsequent, fully amortized principal and
463    interest payments.

464    As Defendants pushed to expand market share, they eased other basic underwriting standards.
465    For example, higher loan-to-value (LTV) and combined loan-to-value (CLTV) ratios were
466    allowed. Likewise, higher debt-to-income (DTI) ratios were allowed. In each case, the higher the
467    ratio the greater the risk that the borrower will default.

468    Defendants knew, or in the exercise of reasonable care should have known, from its own
469    underwriting guidelines industry standards that it was accumulating and selling/reselling risky
470    loans that were likely to end up in default. However, as the pressure mounted to increase market
471    share and originate more loans, Defendants began to grant "exceptions" even to its relaxed
472    underwriting guidelines. Such was the environment that loan officers and underwriters were,
473    from time to time, placed in the position of having to justify why they did not approve a loan that
474    failed to meet underwriting criteria.

475    **Risk Layering**

476    Defendants compromised its underwriting even further by risk layering, i.e. combining high risk
477    loans with one or more relaxed underwriting standards.

478    Defendants knew, or in the exercise of reasonable care should have known, that layered risk
479    would increase the likelihood of default. Among the risk layering Defendants engaged in were
480    approving HARM loans with little to no down payment, little to no documentation, and high
481    DTI/LTV/CLTV ratios. Despite such knowledge, Defendants combined these very risk factors in
482    the loans it promoted to borrowers.

483    Loan officers and mortgage Agents aided and abetted this scheme by working closely with other
484    mortgage Lenders/mortgage bankers to increase loan originations, knowing or having reason to

485   believe that Defendants and other mortgage Lenders/mortgage bankers with whom they did
486   business ignored basic established underwriting standards and acted to mislead the borrower, all
487   to the detriment of the borrower and the consumer of loan products..

488   Petitioner is informed and believe, and on that basis allege, that Defendants, and each of them,
489   engaged and/or actively participated in, authorized, ratified, or had knowledge of, all of the
490   business practices described above in paragraphs 30-42 of this Complaint

491   *UNJUST ENRICHMENT*

492   Petitioner is informed and believes that each and all of the Defendants received a benefit at
493   Petitioner's expense, including but not limited to the following: To the Agent, commissions,
494   yield spread premiums, spurious fees and charges, and other "back end" payments in amounts to
495   be proved at trial; To the originating Lender, commissions, incentive bonuses, resale premiums,
496   surcharges and other "back end" payments in amounts to be proved at trial; To the investors,
497   resale premiums, and high rates of return; To the servicers including EMS, servicing fees,
498   percentages of payment proceeds, charges, and other "back end" payments in amounts to be
499   proved at trial; To all participants, the expectation of future revenues from charges, penalties and
500   fees paid by Petitioner when the unaffordable LOAN was foreclosed or refinanced.

501   By their misrepresentations, omissions and other wrongful acts alleged heretofore, Defendants,
502   and each of them, were unjustly enriched at the expense of Petitioner, and Petitioner was unjustly
503   deprived, and is entitled to restitution in the amount of $744,444.11.

504   *CLAIM TO QUIET TITLE.*

505   Petitioner properly averred a claim to quiet title. Petitioner included both the street address, and
506   the Assessor's Parcel Number for the property. Petitioner has set forth facts concerning the title
507   interests of the subject property. Moreover, as shown above, Petitioner's claims for rescission
508   and fraud are meritorious. As such, Petitioner's bases for quiet title are meritorious as well.

509   Defendants have no title, estate, lien, or interest in the Subject Property in that the purported
510   power of sale contained in the Deed of Trust is of no force or effect because Defendants' security
511   interest in the Subject Property has been rendered void and that the Defendants are not the holder
512   in due course of the Promissory Note. Moreover, because Petitioner properly pled all Defendants'
513   involvement in a fraudulent scheme, all Defendants are liable for the acts of its co-conspirators,

514     "a Petitioner is entitled to damages from those Defendants who concur in the tortious
515     scheme with knowledge of its unlawful purpose." *Wyatt v. Union Mortgage Co., 24 Cal.*
516     *3d 773, 157 Cal. Rptr. 392, 598 P.2d 45 (1979); Novartis Vaccines and Diagnostics, Inc.*
517     *v. Stop Huntingdon Animal Cruelty USA, Inc., 143 Cal. App. 4th 1284, 50 Cal. Rptr. 3d*
518     *27 (1st Dist. 2006); Kidron v. Movie Acquisition Corp., 40 Cal. App. 4th 1571, 47 Cal.*
519     *Rptr. 2d 752 (2d Dist. 1995).*

520     *SUFFICIENCY OF PLEADING*

521     Petitioner has sufficiently pled that relief can be granted on each and every one of the
522     Complaint's causes of action. A complaint should not be dismissed "unless it appears beyond
523     doubt that the Petitioner can prove no set of facts in support of Petitioner claim which would
524     entitle Petitioner to relief." *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* "All
525     allegations of material fact in the complaint are taken as true and construed in the light most
526     favorable to Petitioner." *Argabright v. United States, 35 F.3d 1476, 1479 (9th Cir. 1996).*

527     Attendant, the Complaint includes a "short, plain statement, of the basis for relief." Fed. Rule Civ. Proc.
528     8(a). The Complaint contains cognizable legal theories, sufficient facts to support cognizable legal
529     theories, and seeks remedies to which Petitioner is entitled. *Balistreri v. Pacifica Police Dept., 901 F.2d*
530     *696, 699 (9th Cir. 1988); King v. California, 784 F.2d 910, 913 (9th Cir. 1986).* Moreover, the legal
531     conclusions in the Complaint can and should be drawn from the facts alleged, and, in turn, the court
532     should accept them as such. *Clegg v. Cult Awareness Network, 18 F.3d 752* (9th Cir, 1994). Lastly,
533     Petitioner's complaint contains claims and has a probable validity of proving a "set of facts" in support of
534     their claim entitling them to relief. *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* Therefore,
535     relief as requested herein should be granted.

536                                        **CAUSES OF ACTION**

537     *BREACH OF FIDUCIARY DUTY*

538     Defendants Agent, appraiser, trustee, Lender, et al, and each of them, owed Petitioner a fiduciary
539     duty of care with respect to the mortgage loan transactions and related title activities involving
540     the Trust Property.

541     Defendants breached their duties to Petitioner by, *inter alia,* the conduct described above. Such
542     breaches included, but were not limited to, ensuring their own and Petitioners' compliance with
543     all applicable laws governing the loan transactions in which they were involved, including but
544     not limited to, TILA, HOEPA, **RESPA** and the Regulations X and Z promulgated there under.

ORIGINAL PETITION AND PETITION FOR RESTRAINING ORDER          19 of 25

545    Defendant's breaches of said duties was a direct and proximate cause of economic and non-
546    economic harm and detriment to Petitioner(s).

547    Petitioner did suffer economic, non-economic harm, and detriment as a result of such conduct,
548    all to be shown according to proof at trial of this matter.

549    *CAUSE OF ACTION - NEGLIGENCE/NEGLIGENCE PER SE*

550    Defendants owed a general duty of care with respect to Petitioners, particularly concerning their
551    duty to properly perform due diligence as to the loans and related transactional issues described
552    hereinabove.

553    In addition, Defendants owed a duty of care under TILA, HOEPA, **RESPA** and the Regulations
554    X and Z promulgated there under to, among other things, provide proper disclosures concerning
555    the terms and conditions of the loans they marketed, to refrain from marketing loans they knew
556    or should have known that borrowers could  not afford or maintain, and to avoid paying undue
557    compensation such as "yield spread premiums" to mortgage Agents and loan officers.

558    Defendants knew or in the exercise of reasonable care should have known, that the loan
559    transactions involving Petitioner and other persons similarly situated were defective, unlawful,
560    violative of federal and state laws and regulations, and would subject Petitioner to economic and
561    non-economic harm and other detriment.

562    Petitioner is among the class of persons that TILA, HOEPA, **RESPA** and the Regulations X and
563    Z promulgated there under were intended and designed to protect, and the conduct alleged
564    against Defendants is the type of conduct and harm which the referenced statutes and regulations
565    were designed to deter.

566    As a direct and proximate result of Defendant's negligence, Petitioner suffered economic and
567    non-economic harm in an amount to be shown according to proof at trial.

568    *AGENT: COMMON LAW FRAUD*

569    If any Agents' misrepresentations made herein were not intentional, said misrepresentations were
570    negligent. When the Agents made the representations alleged herein, he/she/it had no reasonable
571    ground for believing them to be true.

572    Agents made these representations with the intention of inducing Petitioner to act in reliance on
573    these representations in the manner hereafter alleged, or with the expectation that Petitioner
574    would so act.

575    Petitioner is informed and believes that Agent et al, facilitated, aided and abetted various Agents
576    in their negligent misrepresentation, and that various Agents were negligent in not implementing
577    procedures such as underwriting standards oversight that would have prevented various Agents
578    from facilitating the irresponsible and wrongful misrepresentations of various Agents    to
579    Defendants .

580    Petitioner is informed and believes that Agent acted in concert along with other others named
581    herein in promulgating false representations to cause Petitioner to enter into the LOAN without
582    knowledge or understanding of the terms thereof.

583    As a proximate result of the negligent misrepresentations of Agents as herein alleged, the
584    Petitioner sustained damages, including monetary loss, emotional distress, loss of credit, loss of
585    opportunities, attorney fees and costs, and other damages to be determined at trial. As a
586    proximate result of Agents' breach of duty and all other actions as alleged herein, Defendants has
587    suffered severe emotional distress, mental anguish, harm, humiliation, embarrassment, and
588    mental and physical pain and anguish, all to Petitioner's damage in an amount to be established
589    at trial.

590    ***PETITIONER PROPERLY AVERRED A CLAIM FOR BREACH OF THE IMPLIED***
591    ***COVENANT OF GOOD FAITH AND FAIR DEALING.***

592    Petitioner properly pled Defendants violated the breach of implied covenant of good faith and
593    fair dealing. "Every contract imposes upon each party a duty of good faith and fair dealing in its
594    performance and its enforcement." *Price v. Wells Fargo Bank, 213 Cal.App.3d 465, 478, 261*
595    *Cal. Rptr. 735 (1989);* Rest.2d Contracts § 205. A mortgage Agent has fiduciary duties. *Wyatt v.*
596    *Union Mortgage Co., (1979) 24 Cal. 3d. 773.* Further, In *Jonathan Neil & Associates, Inc. v*
597    *Jones, (2004) 33 Cal. 4th 917,* the court stated:

598    In the area of insurance contracts the covenant of good faith and fair dealing has taken on a
599    particular significance, in part because of the special relationship between the insurer and the
600    insured. The insurer, when determining whether to settle a claim, must give at least as much

601    consideration to the welfare of its insured as it gives to its own interests. . . The standard is
602    premised on the insurer's obligation to protect the insured's interests . . . *Id. at 937.*

603    Likewise, there is a special relationship between a Agent and borrower. "A person who provides
604    Agentage services to a borrower in a covered loan transaction by soliciting Lenders or otherwise
605    negotiating a consumer loan secured by real property, is the fiduciary of the consumer...this
606    fiduciary duty [is owed] to the consumer regardless of whom else the Agent may be acting as an
607    Agent for . . . The fiduciary duty of the Agent is to deal with the consumer in *good faith.* If the
608    *Agent knew or should have known that the Borrower will or has a likelihood of defaulting ... they*
609    *have a fiduciary duty to the borrower not* to place them in that loan." (California Department of
610    Real Estate, *Section 8: Fiduciary Responsibility,* www.dre.ca.gov). [*Emphasis Added*].

611    All Defendants, willfully breached their implied covenant of good faith and fair dealing with
612    Petitioner when Defendants: (1) Failed to provide all of the proper disclosures; (2) Failed to
613    provide accurate Right to Cancel Notices; (3) Placed Petitioner into Petitioner's current loan
614    product without regard for other more affordable products; (4) Placed Petitioner into a loan
615    without following proper underwriting standards; (5) Failed to disclose to Petitioner that
616    Petitioner was going to default because of the loan being unaffordable; (6) Failed to perform
617    valid and /or properly documented substitutions and assignments so that Petitioner could
618    ascertain Petitioner rights and duties; and (7) Failed to respond in good faith to Petitioner's
619    request for documentation of the servicing of Petitioner's loan and the existence and content of
620    relevant documents. Additionally, Defendants breached their implied covenant of good faith and
621    fair dealing with Petitioner when Defendants initiated foreclosure proceedings even without the
622    right under an alleged power of sale because the purported assignment was not recorded and by
623    willfully and knowingly financially profiting from their malfeasance. Therefore, due to the
624    special relationship inherent in a real estate transaction between Agent and borrower, *and* all
625    Defendants' participation in the conspiracy, the Motion to Dismiss should be denied.

626    ***CAUSE OF ACTION VIOLATION OF TRUTH IN LENDING ACT 15 U.S.C. §1601 ET***
627    ***SEQ***

628    Petitioner hereby incorporates by reference, re-pleads and re-alleges each and every allegation
629    contained in all of the paragraphs of the General Allegations and Facts Common to All Causes of
630    Action as though the same were set forth herein.

631   This consumer credit transaction was subject to the Petitioner's right of rescission as described

632   by *15 U.S.C. § 1635*(a) and Regulation Z § 226.23 (12 C.F.R. § 226.23).

633   More particularly, the same Defendants violated *15 U.S.C. § 1635*(a) and Regulation Z §

634   226.23(b) with regards to the purported Notice of Right to Cancel. As a consequence of this

635   action, the Notice of Right to Cancel documentation was not provided to Petitioner or if

636   furnished, to Petitioner it failed to: Correctly identify the transaction, Clearly and conspicuously

637   disclose the Petitioner's right to rescind the transaction three days after delivery of all required

638   disclosures, Clearly and conspicuously disclose how to exercise the right to rescind the

639   transaction, with a form for that purpose, Clearly and conspicuously disclose the effects of

640   rescission, Clearly and conspicuously disclose the date the rescission period expired.

641   Petitioner is informed and believes that Defendants's violation of the provisions of law rendered

642   the credit transaction null and void, invalidates Defendants's claimed interest in the Subject

643   Property, and entitles Petitioner to damages as proven at trial.

644   ***INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS***

645   The conduct committed by Defendants, driven as it was by profit at the expense of increasingly

646   highly leveraged and vulnerable consumers who placed their faith and trust in the superior

647   knowledge and position of Defendants, was extreme and outrageous and not to be tolerated by

648   civilized society.

649   Defendants either knew that their conduct would cause Petitioner to suffer severe emotional

650   distress, or acted in conscious and/or reckless disregard of the probability that such distress

651   would occur.

652   Petitioner did in fact suffer severe emotional distress as an actual and proximate result of the

653   conduct of Defendants as described hereinabove.

654   As a result of such severe emotional distress, Petitioner suffered economic and non economic

655   harm and detriment, all to be shown according to proof at trial of this matter.

656   Petitioner demands that Defendants provide Petitioner with release of lien on the lien signed by

657   Petitioner and secure to Petitioner quite title;

658    Petitioner demands Defendants disgorge themselves of all enrichment received from Petitioner

659    as payments to Defendants based on the fraudulently secured promissory note in an amount to be

660    calculated by Defendants and verified to Petitioner;

661    Petitioner further demands that Defendants pay to Petitioner an amount equal to trebel the

662    amount Defendants intended to defraud Petitioner of which amount Petitioner calculated to be

663    equal to $1,034,131.35

664                                   **PRAYER**

665    WHEREFORE, Petitioner prays for judgment against the named Defendants, and each of them,

666    as follows:

667          For an emergency restraining order enjoining lender and any successor in interest from

668          foreclosing on Petitioner's Property pending adjudication of Petitioner's claims set forth

669          herein;

670          For a permanent injunction enjoining Defendants from engaging in the fraudulent,

671          deceptive, predatory and negligent acts and practices alleged herein;

672          For quiet title to Property;

673          For rescission of the loan contract and restitution by Defendants to Petitioner according

674          to proof at trial;

675          For disgorgement of all amounts wrongfully acquired by Defendants according to proof

676          at trial;

677          For actual monetary damages in the amount of $744,444.11;

678          For pain and suffering due to extreme mental anguish in an amount to be determined at

679          trial.

680          For pre-judgment and post-judgment interest according to proof at trial;

681          For punitive damages according to proof at trial in an amount equal to $2,233,332.33;

682          For attorney's fees and costs as provided by statute; and,

683          For such other relief as the Court deems just and proper.

684    **Respectfully Submitted,**

685

686    _____

687    **Christopher Campanella**